**Opinion issued August 15, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00151-CR

————————————

**JOHN ACOSTA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District**
**Harris County, Texas**
**Trial Court Case No. 1243560**

---

## O P I N I O N

A jury convicted John Acosta of the delivery or manufacture of a counterfeit

instrument, a Louisiana identification card.[1] The trial court assessed punishment at

---

[1]    TEX. TRANSP. CODE ANN. § 521.456(b) (West 2013).

five-years' community supervision and ninety days in jail. In three issues, Acosta contends that (1) the evidence is legally insufficient to support the verdict, (2) the trial court erred in failing to submit a jury instruction on the defense of mistake of fact, and (3) he was denied effective assistance of counsel because his trial counsel failed to request a jury instruction on the defense of mistake of fact. In two additional issues, Acosta contends that the trial court abused its discretion in overruling his objections after the State (1) attacked defense counsel personally rather than defense counsel's arguments in closing argument and (2) argued matters outside the record in closing argument. In a final issue, Acosta contends that the trial court erred in overruling his motion for mistrial after the State misstated the law contained in the jury charge during final argument. We affirm the trial court's judgment.

## Background

In November 2009, Officers E. Garza and A. Meija, who are members of the major theft division of the Houston Police Department, participated in an undercover investigation of the sale of allegedly counterfeit documents at a Houston flea market. During the investigation, Garza used an alias and purchased a Louisiana identification card from Acosta, who was working at a flea market booth. The exchange between Acosta and the two officers was video recorded; the video and a transcription were admitted into evidence at trial.

Acosta's booth displayed signs or banners stating "Novelty ID cards" and "Not a government document. For novelty use only." Another sign read, "This establishment does not issue, alter, or duplicate government records or documents. All activi [obscured with white tape] involvement in criminal activity is likely to result in apprehension and prosecution by the law." The taped-over portion of the sign read, "All activities in this store are video taped and under strict surveillance." Officer Garza testified that he commonly sees such signs in his investigations of counterfeit documents. The booth also had sample identification cards displayed in a black binder on the counter. The samples included cards with titles such as "Bars Car Club," "Personal Identification," and "Official Identification Card," as well as a Texas driver's license. Officer Garza testified that the samples in the binder did not look authentic: "If you look at them, we all know they're not issued by an authorized agency." For example, the samples stated in red letters "not a government document." Acosta told Garza that the samples had red lettering on them so than no one would steal them from the booth.

When Officer Garza asked about prices, Acosta said that identification cards with a hologram cost $65 and cards without a hologram cost $55. Acosta also told Garza that the price for a card from another state was $60. Garza asked to buy a Louisiana identification card and told Acosta that he planned to work in Louisiana and wanted to cash checks there. Garza testified that Acosta did not tell him that

3

the card he was making was a novelty item or that it would not be appropriate for cashing checks because it was not for official use.

Before buying the card, Officer Garza filled out a form. The form stated "Novelty Form" at the top, "Not a Government Document" in the middle, and "I know this is not a real I.D. Card" under the signature line for the buyer. The form also included lines for the buyer's name, street address, city, state, zip code, date of birth, eye color, height, and sex. Garza gave Acosta a Louisiana address. Acosta asked for Garza's weight, which he provided, and a Social Security number. Garza did not have one; a number was not put on the card. Acosta also asked for a Social Security card for identification "or do I invent one?"

Officer Garza testified that Acosta had a collection of pages "like, a reference guide" with "all the IDs of all these different states" and that Acosta referred to this guide as he made the identification card for Garza. This collection of pages was admitted into evidence. The Louisiana page has pictures of two Louisiana personal driver's licenses. Next to one license is "PRIOR LICENSE; INVALID DEC. 1999"; next to the second picture is "CURRENT LICENSE; VALID IN 2000." The page also states "License number: 9 digits, unspaced, uncoded. First digits are '00's'" and "License term: Valid up to 4 years, expiring on birthday." Acosta, Garza and Officer Mejia discussed the number of digits needed for a Louisiana identification card as compared to the number of digits for

a Texas driver's license. Meija told Acosta that Garza wanted "to have the correct numbers so they will be okay in Louisiana." Garza testified that they told Acosta they wanted the card to look authentic and not suspicious by having the wrong amount of numbers. According to Garza, Acosta looked at the reference guide "to get it right."

Acosta took Officer Garza's picture in front of a blue screen "just like at the DMV[.]" Acosta did not ask Garza to make a funny face or pose. Acosta then printed an identification card.

The Louisiana identification card was admitted into evidence. The front of the card, including the location of all of the information, appears the same as an authentic license. The card contained Officer Garza's photo in the same location as an authentic license. The "issue date" on the card was "4-15-2008," several months before Garza purchased it. Garza testified that, in his experience, use of an issue date other than the date the card is created makes the card look more authentic and less suspicious. He testified further that Acosta told him that the ID would be valid for four years. Based on the birth date that Garza provided, the expiration date shown on the card was "3-14-2012." The "user no." shown on the card is a nine-digit number that starts with two zeros—just like an authentic license. An investigator with the Harris County District Attorney's Office testified that the "user no." on the Louisiana identification card was the driver's license number of a

5

Louisiana resident who died in 2005. In short, the front of the fake identification card appears to the naked eye to be identical in all respects to an authentic identification. Garza testified that the "Louisiana fake ID card looks real."

The back of the card includes boxes to check for "Directive to physician has been filed at tel #," "Emergency contact number," and "Allergic reaction to drugs." Finally, the back included the following list:

A      Not a government document
B      Novelty use only
C      Not for official use.

Garza paid $60 in cash for the card and did not get a receipt. He testified that he has personal knowledge as a police officer about identification cards from Louisiana and that a person obtains a Louisiana driver's license or identification card from the Louisiana Office of Motor Vehicles, which performs the same function as the Texas Department of Motor Vehicle office.

Acosta was arrested approximately two weeks after Garza bought the card. At the time of the arrest, the police recovered blank ID cards in boxes, blank and completed card forms, the printer that Acosta used on the day in question, a laptop computer, and a signature pad. A computer forensics expert, M. Kelly, reviewed the contents of the computer and testified that the computer was registered to Rosa Acosta and that he found documents indicating Acosta had used the computer.

The computer also contained a software program called Instant ID Plus that creates identification cards from different templates. According to Investigator Kelly, a database associated with the program included data for at least 212 transactions in which some form of identification was made. Another file contained approximately 750 pictures of individuals. Kelly further testified that he was familiar with fake IDs being used to commit identity theft and that a government issued card, such as the Louisiana identification card, would not have the words "not a government document," "novelty use only," or "not for official use" on it. Kelly further testified that, based on his experience and training, a fake card with disclaimers could be used in a scam because the lettering can be rubbed off and removed. Even if the lettering cannot be removed, Kelly testified that the Louisiana identification card still could be used because "the front looks just like a Louisiana identification card" and the back typically is not checked.

The jury found Acosta guilty of delivery or manufacture of a counterfeit instrument. Following a punishment hearing, the trial court assessed punishment at five-years' community supervision and ninety days in jail. In his motion for new trial, Acosta contended that (1) the trial court erred in failing to submit a jury instruction on the statutory defense of mistake of fact, (2) he was denied effective assistance of counsel because his trial counsel failed to request a jury instruction on a mistake-of-fact defense, (3) the State's improper jury argument denied him a fair

7

trial, (4) the trial court improperly admitted evidence under Texas Rule of Evidence 403, and (5) the evidence was legally insufficient to support the verdict. The trial court held a hearing, at which trial counsel testified. The trial court denied Acosta's motion with a written order. This appeal followed.

## Insufficiency of the Evidence

In his first issue, Acosta contends that the evidence is legally insufficient to sustain the jury's guilty verdict of delivery or manufacture of a counterfeit instrument, as charged in the indictment.

## A.    Standard of review

We review Acosta's challenge to the legal sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *Ervin v. State*, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). We examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789. Our review includes both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from that evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and alone can be sufficient

8

to establish guilt. *Id.* Although we consider all evidence presented at trial, we do not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the credibility of the witnesses and of the weight given to their testimony, any conflicts or inconsistencies in the evidence are resolved in favor of the verdict. *Westbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

**B.    The offense does not require intent to deceptively pass an instrument off to the purchaser as authentic**

The jury found Acosta guilty of delivery or manufacture of a counterfeit instrument. As set forth in the jury instruction and the Transportation Code, a person commits this offense if the person:

> manufactures or produces with the intent to sell, distribute, or deliver a forged or counterfeit instrument that the person knows is not printed, manufactured, or made by or under the direction of, or issued, sold, or circulated by or under the direction of, a person, board, agency, or authority authorized to do so under Chapter 521, Texas Transportation Code, or under the laws of the United States, another state, or a Canadian province.

*See* TEX. TRANSP. CODE ANN. § 521.456(b) (West 2013) (setting forth offense of delivery or manufacture of counterfeit instrument). The jury was instructed that "instrument" means a "driver's license, driver's license form, personal identification certificate, stamp, permit, license, official signature, certificate,

evidence of fee payment or any other instrument." *See id.* § 521.456(d) (defining "instrument" as used in section 521.456).

The instrument in this case is the Louisiana identification card that Officer Garza purchased from Acosta. According to Acosta, the disclaimers on the back of the card, at the booth, and on the form Garza signed took the card "out of the ambit of one that was forged or counterfeit, because it announced to anyone who looked at it, including the recipient whose signature acknowledged that it was not a real identification card, that it was not, nor was ever intended to be 'a government document' or 'for official use.'" Acosta asserts that the disclaimers that the card was "for novelty use only," "not a government document," and "not for official use" precluded a rational fact finder from concluding beyond a reasonable doubt that he intended to create or sell a counterfeit identification card.

The jury charge does not define "forged" or "counterfeit." According to Acosta, the words are to be given their ordinary meanings, which require the card to be "something that it purported to be, but was not." *See Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996) ("Words which are not statutorily defined are to be given their usual meanings and no specific instructions are required."). Acosta points to a definition of "counterfeit" as "an imitation to be

10

passed off fraudulently or deceptively."[2] Thus, according to Acosta, an essential element of the offense is intent, and proof of intent here was legally insufficient. The State argues that the word "counterfeit" as used in section 521.456(b) does not add to the offense the element that a person manufacture or produce a counterfeit instrument with the intent to pass it off as a genuine instrument or with any intent to defraud. The State points to definitions of "counterfeit" other than the one on which Acosta relies.

Accordingly, we consider the meaning of the word "counterfeit" as used in section 521.456(b). "When interpreting statutory language, we focus on the 'collective' intent or purpose of the legislators who enacted the legislation." *Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011) (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). "We construe a statute according to its plain meaning without considering extratextual factors unless the statutory language is ambiguous or imposing the plain meaning would cause an absurd result." *Id.* (quoting *Boykin*, 818 S.W.2d at 785-86) (footnote omitted); *see also State v. Neesley*, 239 S.W.3d 780, 783 (Tex. Crim. App. 2007); *see* TEX. GOV'T CODE ANN. § 311.011 (West 2013) ( "Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

---

[2]     *See* Dictionary.com, http://dictionary.reference.com/browse/counterfeit?s=t (last visited July 26, 2013) (defining "counterfeit," in part as "an imitation intended to be passed off fraudulently or deceptively as genuine").

11

The Transportation Code does not define "counterfeit" for purposes of section 521.456. "When analyzing the sufficiency of the evidence, undefined statutory terms 'are to be understood as ordinary usage allows, and jurors may thus freely read statutory language to have any meaning which is acceptable in common parlance.'" *Clinton*, 354 S.W.3d at 800 (quoting *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992)); *see Medford v. State*, 13 S.W.3d 769, 771 (Tex. Crim. App. 2000) ("[T]erms not legislatively defined are typically understood as ordinary usage allows."); *see also Deleon v. State*, 105 S.W.3d 47, 50 (Tex. App.—El Paso 2003, no pet.) (concluding that term "fictitious" used in Transportation Code section 521.451 must be given its plain meaning). Statutory terms that have a technical meaning generally will be construed consistently with that technical meaning. *See Medford*, 13 S.W.3d at 772.

As an adjective, "counterfeit" is defined as "spurious: not genuine or authentic" or "made in fraudulent imitation: produced with intent to deceive." WEBSTER'S THIRD NEW INT'L DICTIONARY 519 (1976). Black's Law Dictionary defines "counterfeit" as

> [t]o unlawfully forge, copy, or imitate an item, esp. money or a negotiable instrument (such as a security or promissory note) or other officially issued item of value (such as a postage stamp or a food stamp), or to possess such an item without authorization and with the intent to deceive or defraud by presenting the item as genuine.

BLACK'S LAW DICTIONARY 402 (9th ed. 2009). "Counterfeit" also refers "to something that is fashioned to resemble something else"; "a close copy of an item, such as legal tender, a stamp or a bond[.]" BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 432–33 (3d ed. 2011). Thus, the ordinary meaning of "counterfeit" may include an instrument that is not authentic but resembles an authentic item.

Section 521.456 itself indicates that the legislature intended that meaning. To commit an offense, a person must know that the instrument is not manufactured under the direction of an authorized person or authority. TEX. TRANSP. CODE ANN. § 521.456(b) (West 2013). This requirement suggests that the item must appear to be authentic but is not because it is not approved by the government. Moreover, another section of the Transportation Code, section 548.603, defines "counterfeit" in connection with several offenses that involve displaying, making or possessing a counterfeit inspection certificate or insurance document as "an imitation of a document that is printed, engraved, copied, photographed, forged, manufactured by a person not authorized to take that action[.]" *Id.* § 548.603(e)(1) (West 2011); *see id.* at § 548.603(e)(2) (defining "inspection certificate" as a "document"). These provisions indicate that a "counterfeit instrument" includes a copy or imitation made without authorization.

13

Our sister court has interpreted the predecessor to section 521.456 in a manner that supports this construction of the term "counterfeit" in section 521.456. In *Barber v. State*, 757 S.W.2d 83 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd), the Fourteenth Court of Appeals considered a conviction for possession with intent to use and sell counterfeit temporary driver's licenses. The defendant argued that the evidence was insufficient to prove that the temporary licenses were counterfeit because the State failed to prove the state authority did not, in fact, authorize their manufacture. *Id.* at 86. At trial, a state trooper testified that the licenses were not authentic Texas Department of Public Safety licenses because the licenses did not have perforated edges, had the same receipt numbers, and were not printed with the same quality as authentic licenses. The trooper emphasized that no one is authorized to counterfeit Texas driver's licenses. *Id.* at 86–87. The court concluded that the evidence was sufficient to support the conviction. *Id.* at 87. The trial court, as the trier of fact, was entitled to believe the trooper's testimony that no one was authorized to print the licenses and "that they were in fact counterfeit." *Id.* at 87. *Barber* indicates that the court understood "counterfeit" to mean an instrument that was inauthentic or an imitation not made by one authorized to do so. *See Ex parte Smith*, 849 S.W.2d 832, 834 (Tex. App.—Amarillo 1992, no pet.) (describing predecessor statute to section 521.456 as punishing manufacture, distribution, or possession of "fake driver's licenses").

14

The only culpable mental state required to prove that an instrument is counterfeit is that expressly set forth in the statute. The offense requires (1) the intent to sell, distribute or deliver a forged or counterfeit instrument, and (2) the knowledge that the instrument is not printed, manufactured or made by or under the direction of an authorized person or entity. TEX. TRANSP. CODE ANN. § 521.456(b) (West 2013). The statute does not require an intent to deceptively pass the instrument off to the purchaser as authentic. Thus, although there must be an intent to sell, distribute or deliver a counterfeit document that one knows was not made by an authorized entity, there does not have to be an intent to trick the purchaser into believing it is genuine.

## C.    The evidence is sufficient to support the conviction

The evidence, viewed in the light most favorable to the verdict, is sufficient to support the jury's finding that Acosta delivered or manufactured a counterfeit license. Acosta manufactured the identification card and sold it to Officer Garza. The identification card purports to be an identification card issued by the State of Louisiana and closely resembles a Louisiana driver's license, as shown in the guide to which Acosta referred when making the card "to get it right." A comparison of the two shows that Acosta's identification card very closely resembles an authentic Louisiana driver's license.

The Louisiana "Personal Driver's License" pictured below is included in the reference guide that Acosta used to make Officer Garza's Louisiana identification card.



The information on Garza's identification card—including the two photographs, the name, address, signature, and expiration and issue dates—was placed in the same position as the information on the driver's license pictured above. Following the driver's license in the reference guide, Acosta used a nine-digit user number starting with two zeros, an expiration date based on the birthday that Garza provided, and the issue date shown on the identification card.

Acosta backdated the issue date, which Officer Garza testified is frequently done to make a card look more authentic and less suspicious when used near the date on which it was made. Acosta told Garza that the card was good for four years—the same length of time shown on an authentic license. The phrases "[n]ot a government document," "[f]or novelty use," and "[n]ot for official use" are

16

inconspicuous; they are in small print on the back of the card and are placed to appear as if they are part of the card.[3] Investigator Kelly testified that the front of the card looks "just like a Louisiana identification card." The evidence further shows that individuals who sell fake identifications commonly characterize their products as novelty items and sell them at flea market booths advertising novelty ID cards. Although Garza, in his requests to Acosta, repeatedly stated that he wanted the card to appear authentic and that he intended to use the identification card to cash checks, Acosta did not inform Garza that the card could not be used for this purpose. Finally, the jury viewed the video of the transaction at the flea market, saw the card that Garza purchased from Acosta, and saw the guide that Acosta used to make the card. Viewing the evidence in the light most favorable to the jury verdict, we conclude that the evidence is legally sufficient to support the conviction. We overrule Acosta's first issue.

**Failure to Submit Jury Instruction**

In his second issue, Acosta contends that the trial court erred in failing to instruct the jury on the defense of mistake of fact. The defense is codified in

---

[3]     Section 521.453 of the Transportation Code provides that a person commits an offense if the person possesses a document that is deceptively similar to a driver's license or personal identification document, with the intent to represent that the person is 21 years or older, unless the document displays the statement "NOT A GOVERNMENT DOCUMENT" printed diagonally, "clearly and indelibly" in solid red capital letters on the front and back of the document. TEX. TRANSP. CODE ANN. § 521.453(a) (West 2013). In contrast, the card that Officer Garza purchased did not have this phrase printed diagonally in solid red capital letters on the front and back.

17

section 8.02(a) of the Penal Code, which provides that it is a defense to prosecution if the actor, through a mistake, formed a reasonable belief about a matter of fact that negates the kind of culpability required for commission of the offense. TEX. PENAL CODE ANN. § 8.02(a) (West 2011). Acosta asserts that he was entitled to a mistake-of-fact instruction based on the evidence of the disclaimers printed on the identification card and displayed at the flea market booth in combination with testimony that a government-issued identification card would not contain those disclaimers. Acosta did not request a jury instruction on the defense of mistake of fact or object to a failure to include an instruction. Recognizing that he did not request an instruction, he further asserts that the failure to instruct the jury egregiously harmed him. *See, e.g.*, *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g) (concluding that if proper jury charge objection is not made at trial, reversal is proper only for "egregious harm"), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex. Crim. App. 1988)).

In effect, Acosta contends that the trial court was required to submit the instruction *sua sponte* and the failure to do so was erroneous. *See* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (providing that trial court shall deliver to jury "a written charge distinctly setting forth the law applicable to the case"). The duty to instruct on law applicable to the case exists even when defense counsel fails to

object to inclusions or exclusions in the charge, and may require a trial court to provide the jury with law applicable to the case *sua sponte*. *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). A trial court, however, has no duty to instruct a jury on a defensive issue *sua sponte*. *Id.* at 487. Indeed, the Court of Criminal Appeals has specifically held that a trial court does not err in failing to submit the defense of mistake of fact under article 36.14 unless the defendant timely requests the issue or objects to the omission of the issue from the jury charge. *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998).

Acosta did not request that the trial court include a jury instruction on the mistake-of-fact defense. Absent that request, he cannot demonstrate error in the charge. We overrule his second issue.

## Ineffective Assistance of Counsel

Acosta contends that his trial counsel was ineffective because counsel failed to request a jury instruction on the defense of mistake of fact. Acosta raised his ineffective assistance complaint in a motion for new trial. After a hearing at which trial counsel testified, the trial court denied the motion.

### A. Standard of review

In *Strickland v. Washington,* the United States Supreme Court recognized that a criminal defendant has a Sixth Amendment right to effective assistance of counsel, observing the "crucial role" the right to counsel plays in our adversarial

system. 466 U.S. 668, 685, 104 S. Ct. 2052, 2063 (1984); *see Ex parte Jimenez,* 364 S.W.3d 866, 882–83 (Tex. Crim. App. 2012). A criminal defendant claiming that trial counsel was ineffective must prove that (1) trial counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced his defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068; *see Jimenez,* 364 S.W.3d at 883. Acosta must prove that his trial counsel was ineffective by a preponderance of the evidence. *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012) (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2052).

To determine whether Acosta has shown counsel's performance was deficient under the first prong of the *Strickland* analysis, we look to the totality of the representation and the particular circumstances of the case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *see Jimenez*, 364 S.W.3d at 883 (stating that we review trial counsel's efficacy in light of totality of representation from viewpoint of time of trial; we may not review trial counsel's conduct through "20/20 hindsight"). We indulge a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant decisions and that the challenged action might be considered sound trial

strategy. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065; *see Jimenez,* 364 S.W.3d at 883; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004). "To overcome the presumption of reasonable professional assistance, 'any allegation of ineffectiveness must be firmly founded in the record[.]'" *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (quoting *Thompson*, 9 S.W.3d at 813). Because there are "countless ways" to provide effective assistance, our scrutiny of trial counsel's conduct must be highly deferential. *Ex parte Rogers,* 369 S.W.3d at 862 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

Under the second prong of the *Strickland* analysis, we determine whether Acosta has shown a reasonable probability that, but for his counsel's deficient performance, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068; *Andrews v. State,* 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068.

When, as here, an appellant raises the issue of ineffective assistance in a motion for new trial, we review the trial court's denial of the motion for an abuse of discretion. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012); *Rodriguez v. State,* 329 S.W.3d 74, 81 (Tex. App.—Houston [14th Dist.] 2010, no pet.). An abuse of discretion occurs when the trial court's decision is so clearly

wrong as to lie outside the zone of reasonable disagreement. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). A trial court abuses its discretion only when no reasonable view of the record would support the trial court's ruling. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006).

At a hearing on a motion for new trial, the trial court is the sole judge of witness credibility. *See Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001); *Alexander v. State*, 282 SW3d 701, 706 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Melton v. State*, 987 S.W.2d 72, 75 (Tex. App.—Dallas 1998, no pet)). We view evidence in the light most favorable to the trial court's ruling, and will reverse only if no reasonable view of the record could support the trial court's finding. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). We defer to the trial court's resolution of historical facts and conclude that a reasonable view of the evidence supports the trial court's decision to deny Acosta's motion for new trial based on ineffective assistance of counsel in failing to request a jury instruction on a mistake-of-fact defense.

## B. Trial counsel was not ineffective

The trial court denied Acosta's motion for new trial, finding:

The Court did not fail to submit a jury instruction on mistake of fact because such instruction was not requested. Upon conclusion of the trial, the Court met with counsel from both sides to discuss proposed issues to be submitted on the jury charge. "Mistake of fact" was

22

discussed and debated and it was clear that the defense had considered the merits of such charge, and in light of the overwhelming evidence. The defense made a tactical decision not to submit such a request and, instead, to rely upon their primary trial tactic that the counterfeit or forged document in question failed to meet the standard of, in fact, being counterfeit or forged.

Acosta contends that the trial strategy was not reasonable because it was not informed by a reasonable investigation into the facts and controlling legal authority.

Because Acosta's trial counsel testified at the motion for new trial hearing and provided his affidavit, we have insight into his strategy during the trial. Trial counsel testified at length about the mistake-of-fact defense and his decision not to request an instruction. He testified that co-counsel and he were focused on the words "forged" and "counterfeit" and "they were part and parcel with the word 'intent' because of the way the statute reads, whether or not he intended to forge—present a forged or a counterfeit or produce a forged or counterfeit document." The words "have intent as part of their own definition in layman's terms." The defense's position, based on conversations with Acosta, was that the identification card was not a forged or counterfeit document. The disclaimer language on the card made it "a per se non-forged or counterfeit document." Counsel testified that his understanding was that mistake of fact "goes to his intent as it is the mens rea

of the statute, not as it is to the definition of one of the terms that may or may not be defined."[4]

Trial counsel also testified that there was a tactical downside to requesting the instruction—getting an instruction that the defense did not want. He testified that he believed arguing a mistake-of-fact defense would be tantamount to an admission that Acosta committed a crime by creating a counterfeit document and would undermine the defensive theory that no crime was committed. Trial counsel's affidavit, which was admitted into evidence at the hearing, echoes his testimony:

> Our decision not to request this instruction was based on two beliefs. First, we felt that a Mistake of Fact defense was probably not applicable to the case. We felt that our set of facts would have lent itself more to a mistake of law claim, although we still did not have sufficient evidence to raise that defense. Second, we felt that the defense would dilute the strength of our primary argument—that Mr. Acosta did not violate the law because the instruments were not forged. We did not feel that he was "mistaken" in his beliefs that if he put in the warning language that he was somehow not guilty of the crime charged. We felt and argued (beginning in voir dire) that what he manufactured was not a forged document and hence not a crime. [Co-counsel] and I discussed that if I argued Mistake of Fact at

---

[4]    In *Celis v. State*, the Court of Criminal Appeals recently reaffirmed that a mistake-of-fact instruction "applies only with respect to elements that require proof of a culpable mental state." No. PD-1584-11 & No. PD-1585-11, 2013 WL 2373114, at \*8 (Tex. Crim. App. May 15, 2013) (citing *Beggs v. State*, 597 S.W.2d 375, 378 (Tex. Crim. App. [Panel Op.] 1980)). In *Celis*, the defendant was charged with the offense of holding himself out as a lawyer and argued that he was entitled to a mistake-of-fact instruction because he mistakenly believed he was licensed and in good standing to practice law in Mexico. *Id.* at \*3, 10. He was not, however, entitled to the instruction because his mistaken belief did not negate the culpable mental state required by the statute under which he was charged. *Id.* at \*10.

closing that it would undermine our position that he wasn't guilty because what he did was not a crime. If we had asked for a Mistake of Fact charge we felt like we would be obligated to argue it and it simply wasn't an argument that we felt was appropriate to make.

To establish deficient performance under *Strickland*'s first prong, a defendant must show that no reasonable trial strategy could justify counsel's conduct. *See Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065; *Andrews,* 159 S.W.3d at 102. A defensive issue "is a strategic decision 'generally left to the lawyer and the client.'" *Taylor*, 332 S.W.3d at 487 (quoting *Posey*, 966 S.W.2d at 63); *see Okonkwo v. State*, 398 S.W.3d 689, 697 (Tex. Crim. App. 2013) (confirming that "defensive issues 'frequently depend upon trial strategy and tactics,'" and quoting *Tolbert v. State*, 306 S.W.3d 776, 780 (Tex. Crim. App. 2010)). Acosta's defense theory, as articulated by his trial counsel at the motion for new trial hearing and shown by the trial record, was that the identification card was not counterfeit "per se" because of the disclaimers on the back of the card and around the booth. If a mistake-of-fact instruction had been requested and given, counsel believed it would be implied that the card was, in fact, forged or counterfeit, but that Acosta had a reasonable belief it was not. *See* TEX. PEN. CODE ANN. § 8.02(a) (West 2011) (stating defense that actor "through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense").

Acosta's trial counsel testified that he discussed a mistake-of-fact defense with co-counsel and with the trial court and the State in preparing the jury charge. Trial counsel did not recall explaining what "mistake of fact" meant as a defense to Acosta or asking his opinion on the instruction. Acosta, however, was present throughout the discussions. Additionally, counsel and Acosta "talked quite a bit, and I think we knew what the defense was. I thought we were all on the same page[.]" There was never a point when counsel thought that they should ask for the defense, taking into account everything that occurred at trial.

Acosta contends that trial counsel's decision not to request a mistake-of-fact instruction is not entitled to any deference because the decision was not based on an informed legal and factual investigation, was based on a misunderstanding of the law, and produced no tactical benefit. Acosta's argument rests, in part, on an argument that he was entitled to the instruction, if requested in this case. But even if Acosta were entitled to the instruction, if requested, we cannot conclude that the failure to request the instruction was uninformed. Trial counsel and his co-counsel met with Acosta multiple times, read the State's file on the case, read the offense report, and obtained discovery. Trial counsel testified that, as to mistake-of-fact, he did not recall conducting any "independent pretrial research" on the defense but looked at the statute once the jury charge was discussed. When asked about his affidavit statement that the defense did not apply, he answered, "I still don't know

26

that I agree with you that it does apply in this particular case. . . . Again, I read case law on it. I have looked at the statute and I still struggle as to whether or not this set of facts raised that instruction or was more of a mistake of law, not a legitimate one, but more of a, 'Hey, I mistook the law.'" Thus, counsel concluded that denying the instrument was counterfeit was a stronger defense than admitting the document was counterfeit while arguing Acosta lacked the necessary intent due to his mistake of fact.

We cannot conclude that Acosta's counsel's choice not to request an instruction was an unreasonable trial strategy.[5] The trial court's ruling that Acosta was not denied effective assistance of counsel does not lie outside the zone of reasonable disagreement. *See Okonkwo*, 398 S.W.3d at 697 (concluding that, even if mistake-of-fact instruction was permitted, counsel was not objectively unreasonable by failing to request instruction when it was inconsistent with defense theory at trial and would have misled jury as to State's burden of proof). Considering the evidence in the light most favorable to the trial court ruling and in light of trial counsel's reasonably articulated trial strategy to not request the jury

---

[5] In supplemental briefing, Acosta asserts that, at the motion for new trial hearing, Acosta's trial counsel "jettisoned [his] belief" that a mistake-of-fact instruction was inconsistent with the defense theory; however, trial counsel did testify at that hearing about the defense's theory and the "tactical downside" to requesting and receiving the instruction at the hearing. Moreover, we consider all of the evidence in the light most favorable to the trial court's ruling. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013) (citing *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).

27

instruction, Acosta fails to meet the first prong of the *Strickland* test. Because the trial court did not abuse its discretion in denying Acosta's motion for new trial as to the claim of ineffective assistance of counsel, we overrule Acosta's third issue.

**Improper Closing Argument**

In his fourth and fifth issues, Acosta contends that the trial court erred in overruling his objections when the State (1) attacked defense counsel personally and (2) argued matters outside the record in closing argument. In his sixth point of error, Acosta argues that the trial court erred in overruling his motion for mistrial after the State repeatedly misstated the law in the jury charge during closing argument.

**A.     Standard of review**

The law requires, and presumes, a fair trial, free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Proper jury argument generally must encompass one of the following areas: (1) a summation of the evidence presented at trial, (2) a reasonable deduction drawn from that evidence, (3) an answer to the opposing counsel's argument, or (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Sandoval v. State,* 52 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). To determine whether a jury argument properly falls within one of these categories, we consider the argument in light of the entire record. *Sandoval,* 52

S.W.3d at 857. Even when an argument exceeds permissible bounds, the argument does not constitute reversible error unless, in light of the record as a whole, the argument is extreme, manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).

## B.    "Striking over counsel's shoulders"

When a prosecutor makes uninvited and unsubstantiated accusations of improper conduct directed toward a defendant's attorney in an attempt to prejudice the jury against the defendant, the State "strik[es] a defendant over the shoulders of his counsel." *See Gomez v. State,* 704 S.W.2d 770, 771–72 (Tex. Crim. App. 1985); *Phillips v. State*, 130 S.W.3d 343, 355 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006). The State risks striking at a defendant over counsel's shoulders when it argues about defense counsel personally rather than the merits of the case or when it explicitly impugns defense counsel's character. *See Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Such an argument is improper. *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984).

Acosta contends that the State struck at defendant over counsel's shoulder in two instances. First, the State argued during closing, "Now, with respect to the transcript, don't be fooled by this. Okay. This is good lawyering, folks." Second,

29

the State argued, "So the idea that this is a legitimate business that paid taxes, that had some sort of franchising agreement, that's not evidence. That was just words from the defense attorney's mouth. You have no proof of that. And I think, you know why you don't have proof of that."

Argument made in response to defendant's argument, however, is proper. *Cole v. State*, 194 S.W.3d 538, 546 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). If the defense counsel invites argument, then the State may respond appropriately. *See Albiar v. State,* 739 S.W.2d 360, 362 (Tex. Crim. App. 1987). The State may attack the defense counsel's argument; that is different from attacking the defense counsel personally. *Magana v. State*, 177 S.W.3d 670, 675 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

The State argued in response to Acosta's jury arguments and attacked only the defense counsel's arguments, not defense counsel personally. In his jury argument, Acosta's trial counsel referred directly to the transcript of the transaction between Acosta and the officers on the day in question and to comments that the officers made to each other about "stick[ing]" Acosta with a felony. The State's argument about the transcript responded directly to Acosta's counsel's argument. The State's argument about "words from the defense attorney's mouth" responded to Acosta's counsel's argument that Acosta worked at a "business." During the trial, Acosta's counsel questioned Officer Garza about whether he knew if the flea-

30

market-booth business was registered in Texas and paid franchise taxes. Garza answered that he did not know. During the jury argument, Acosta's counsel referred to "the place of business" and "the business." The State's argument responded to defense counsel's argument suggesting that Acosta operated a legitimate business. *See Swarb v. State*, 125 S.W.3d 672, 685 (Tex. App.— Houston [1st Dist.] 2003, pet. dism'd) (concluding that State's argument that defense had thrown evidence "up against the wall like mud hoping some of it will stick to you" was within invited argument and thus overruling objection was not abuse of discretion). We conclude that the trial court did not err in overruling Acosta's objections to the State's argument and overrule Acosta's fourth issue.

## C.     Argument outside the record

In his fifth issue, Acosta contends that the trial court erred in overruling his objections to the State's argument on matters outside the record. He asserts that the State argued matters outside the record when it argued that "[e]very piece of evidence . . . represent[ed] an identification . . . to be used against real victims." Acosta's counsel objected to the argument as outside the record and inflammatory; the trial court overruled the objection. The State continued to discuss ways in which a fake identification could be used. The State concluded its argument with reference to a seventeen-year-old who goes "to the club to get drunk, and she gets in a car wreck on her way home and her mother gets that horrible call . . . as to why

31

her 17-year-old is drinking alcohol in a club." The trial court again overruled defense counsel's objection. The State continued its argument, referring to an illegal immigrant who uses "that identification" to collect a paycheck and a college student who does not get student loans because someone else used his identity. Acosta's counsel again objected, "He's not on trial for identity theft. He's on trial for creating what they believe to be a forged document. This argument goes way beyond the scope of this crime and what they have to prove in their burden. [The State's] trying to inflame the jury. It's improper argument."

A plea for law enforcement is proper argument and may take many forms, including arguments that draw on the jury verdict's impact on the deterrence of crime in general and the community at large. *Borjan v. State*, 787 S.W.2d 53, 55–56 (Tex. Crim. App. 1990) (observing that State may argue that jury should deter specific crimes by its verdict); *Nelson v. State*, 881 S.W.2d 97, 102 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Moreover, matters of common knowledge may be incorporated into final argument without express support in the evidence. *Carter v. State*, 614 S.W.2d 821, 823 (Tex. Crim. App. [Panel Op.] 1981).

The State's argument was not improper. The State did not argue that Acosta committed identity theft. The State referred to identifications "in the hands of people who may or may not, but probably will, use these identifications for criminal purposes." Additionally, the evidence included testimony about use of

fake identification documents in scams and for identity theft and about records found on the computer seized at the flea market booth detailing approximately 212 transactions related to making IDs. Use of false identifications in identity theft is common knowledge. Thus, the State's argument was a permissible plea for law enforcement. We conclude that the trial court did not err in overruling Acosta's objections to the State's argument and, therefore, overrule Acosta's fifth issue.

**D.      Misstatement of the law**

Acosta contends that the trial court erred in overruling his motion for mistrial after the State misstated the law contained in the jury charge during the State's final argument. But Acosta also acknowledges that the trial court sustained his counsel's objections. When it sustained the objections, the trial court directed the jury to the statement of the law contained in the charge as a statement of what the State was required to prove beyond a reasonable doubt. Acosta asserts that sustaining the objection and directing the jury to the charge did not cure the error.

To complain of improper jury argument, a defendant must generally object to the argument and pursue the objection to an adverse ruling. *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). If the trial court sustains the objection, the defendant must request an instruction to disregard and move for a mistrial. *Washington v. State*, 127 S.W.3d 111, 115–16 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Cook v. State,* 858 S.W.2d 467, 473 (Tex. Crim. App. 1993)).

33

Acosta does not point out, nor can we find, where in the record he requested a mistrial. When an appellant has been given all the relief he requested, "there is nothing to complain of on appeal." *Cook*, 858 S.W.2d at 473. The trial court sustained Acosta's objections and directed the jury to the law set out in the court's charge. Acosta did not move for a mistrial and did not object to the State's further argument on the law. Acosta did not preserve a complaint for appeal; we overrule his sixth issue. *See Washington*, 127 S.W.3d at 116 (citing TEX. R. APP. P. 33.1) (holding that defendant who did not obtain adverse ruling on objection to jury argument did not preserve point of error for appeal).

**Conclusion**

Having overruled each of Acosta's issues, we affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Higley, Brown, and Halbach.[6]

Publish. TEX. R. APP. P. 47.2(b).

---

[6] The Honorable Joseph "Tad" Halbach, Judge of the 333rd District Court of Harris County, participating by assignment.