**Opinion issued July 31, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00881-CR

———————————

## JENNIFER H ZARNFALLER, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1370846**

---

## MEMORANDUM OPINION

A jury found appellant, Jennifer H. Zarnfaller, guilty of the felony offense of injury to a child,[1] and the trial court assessed her punishment at confinement for eighty years. In thirteen issues, appellant contends that the evidence is legally

---

[1] *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(1), (e) (Vernon Supp. 2017); TEX. FAM. CODE ANN. § 151.001 (Vernon 2014).

insufficient to support her conviction and her trial counsel provided her with ineffective assistance.

We affirm.

## Background

Veronica Parga-Lopez, formerly the assistant property manager and a tenant at the Wimbledon Apartments in Spring, Texas (the "apartment complex"), testified that in July 2010, appellant lived with her mother in an apartment near Parga-Lopez. Appellant would often come to see Parga-Lopez in the leasing office, "boo-hooing, . . . always crying, always depressed, always, . . . hysterical." Parga-Lopez would listen to appellant, who would confide in her. At one point, appellant, while pregnant with the complainant, told Parga-Lopez that "[s]he didn't want the [complainant]."

After the complainant's birth, appellant again told Parga-Lopez that "she didn't want the [complainant]." And she specifically asked Parga-Lopez to "take" the complainant. This caused Parga-Lopez "a lot of concern," particularly about appellant's "ability to mother" the complainant. Parga-Lopez opined that appellant did not "enjoy[] having [the complainant]," who, she felt, "was a bother" to appellant.

Parga-Lopez noted that the complainant "was sometimes dirty and smelled like smoke, like cigarettes." Appellant "constantly drank" and smoked cigarettes

2

inside her apartment. She was not employed. Her mother, Rona Landon, was the "only provider" for the family. And appellant and her boyfriend, Vikas Sharma, spent "most of the time" at home in the apartment with the complainant.

Parga-Lopez explained that she and her daughter, Dora, would occasionally babysit the complainant. The last time that they watched her, Dora noticed that the complainant was "not her usual self" and "just laid [sic] there."[2] She was also "fussy," "irritable," and not smiling. And she "didn't want to eat" or play. When Parga-Lopez sought to comfort the complainant by massaging her head, she noticed that her head was "real soft on the side," "kind of like how [a] breast feels, like just a gel." Alarmed, Parga-Lopez tried to reach appellant and Landon, but appellant "never came to get" the complainant. When Landon came to pick up the complainant later that night, Parga-Lopez expressed her concern about the complainant's head and demeanor.

Parga-Lopez further testified that thereafter, her concern for the complainant grew when she noticed that appellant "didn't come over anymore, didn't go to the [leasing] office, . . . [and] just stayed inside." When Parga-Lopez later spoke to appellant about the condition of the complainant's head, appellant responded that

---

[2] Parga-Lopez also noted that on another occasion, appellant "bang[ed]" on the door to her apartment. When Parga-Lopez opened it, appellant screamed, "I don't know what happened." The complainant "had blood" on her and a cut inside her mouth and appellant told Parga-Lopez that the complainant had been "crawling . . . and [then] stood up and fell."

3

she would "take [the complainant] to the doctor." Parga-Lopez did not see the complainant that day, and she opined that appellant was "hiding something."

Parga-Lopez explained that on the day of the complainant's death, July 28, 2010, she, while away from her apartment, received a telephone call from the apartment complex's property manager, who told her that "something had happened to" the complainant. When Parga-Lopez arrived home, Dora, who was crying, told Parga-Lopez that she had been "looking out the window" and heard appellant "outside screaming," "My Baby, my baby, my baby." Dora then saw emergency medical personnel arrive and take the complainant to a hospital.

Harris County Sheriff's Office ("HCSO") Deputy M. Newcomb testified that on July 28, 2010, he was dispatched to the apartment complex for "a CPR in progress." When he arrived, appellant, Sharma, and the complainant were present.

Vivien Miller, a paramedic for Cypress Creek EMS, testified that on July 28, 2010, she was dispatched to the apartment complex in response to a call about a "cardiac arrest" of an infant. When she arrived, the scene was "complete chaos," and she had great difficulty in "determin[ing] if any type of compressions [had been] done prior to [her] arrival, which is very vital." According to the complainant's family members, she "had been feeling ill all day and . . . resting in a swing carrier." When the family members "went to check on her . . . and picked

4

her up," they discovered that "she was unresponsive and not breathing," and they telephoned for emergency assistance.

Miller explained that her examination of the complainant revealed that she had "no pulse" and was not "breathing whatsoever." Miller noted that the complainant had "bruises on her face," her "little legs" were "so dirty," and her "rectum did not look normal." The complainant's body temperature was ninety-four degrees, indicating that she was in "a state of septic shock," which would have occurred "over [a period] of days." This constituted a "red flag" to Miller because it "indicated that the [complainant] couldn't have been recently ill as reported" by her family members.

Miller further testified that despite extensive lifesaving measures administered by emergency medical personnel, the complainant remained "in asystole," meaning "there [was] no -- absolutely no activity of [her] heart, no muscles in [her] heart [were] moving, . . . [and] no cells in [her] heart muscle itself [were] working at all." The complainant, who showed no "signs of life," was then transported by ambulance to a hospital, where Miller saw appellant's mother "yell[]" at "mak[e] comments toward" appellant.

Dr. Douglas Kasper, the attending physician in the emergency room at the hospital where the complainant was treated, testified that on July 28, 2010, he examined the complainant. She was unresponsive, had "no respirations," had no

pulse or "evidence of cardiac activity," had severe hypothermia, and was dead. Because the complainant had "no signs of life," Kasper opined that "nothing else could be done" for her.

Dr. Kasper noted that when he informed appellant of the complainant's death, her "affect was blunted" and "strange." And she did not seem to "want to be involved." Kasper opined that the "story" that appellant had provided to emergency medical personnel about what happened to the complainant was "not congruent" with "th[e] massive amount of trauma[]" that the complainant had sustained. He also stated that he did not believe that whatever had happened to the complainant was "accidental."

After he had pronounced the complainant dead, Dr. Kasper ordered a full scan of the body because of appellant's "affect" and "things that [he had] found" during his examination of the complainant. For instance, he found that the complainant's skull was "crushed" or "creaking or cracking," indicating that she had suffered "skull fractures" and "head trauma." And her skull "felt mushy," "like there was lots of movement." According to Kasper, "something grave had occurred."[3]

In regard to the full body scan, Dr. Kasper explained that it showed that the complainant's head had sustained "multiple skull fractures," including a

_____

[3] Dr. Kasper noted that his examination of the complainant also showed that she had a "[d]ilated rectum with tears," which were "old."

6

"depressed skull fracture," "in numerous locations"; "hemorrhaging outside the skull"; an epidural hematoma "all over the scalp," indicating that "a very large blood vessel [had been] damaged"; a subdural hematoma, indicating that "bridging veins [had been] damaged"; and other bleeding "inside the brain itself." According to Kasper, the "depressed skull fracture" indicated that "some blunt force trauma" to the complainant had occurred, and the force used to cause the fracture would have been significant. He also noted that the complainant had a pneumomediastinum, meaning "there was air around the heart where it shouldn't be"; "a distal tibia/fibula fracture"; a pneumothorax, meaning there was "air outside of the lung where it's not supposed to be"; "bruising of the lung"; "gas in [her] left liver lobe," potentially indicating a "bowel wall injury"; and a "dilated rectum." Kasper opined that the "air around the heart" and the "air outside of the lung" could have been related to a trauma, including a blunt force trauma. And the "tibia/fibula fracture" was "consistent with nonaccidental trauma" because "a child that's not ambulatory can't really muster up the acceleration or deceleration to harm themselves in that way." Kasper further opined, therefore, that there was a "high probability" that "somebody had grabbed [the complainant] by the leg . . . and swung [her] around the room" or grabbed her "by [a] lower extremity and str[uck] her head against an object."

7

Deputy J. Ortiz, a member of the HCSO crime scene unit, testified that on July 28, 2010, he was dispatched to the hospital to photograph the "wounds" found on the complainant. He noted that she had "readily apparent" "bruising on her cheek" and chest, and she had a "lemon-size bump" on the right side of her head, which was "a different color" than the other parts of the complainant's skin. The complainant also had "redness behind [her] ear," which could be "visibly see[n]" and "some [other] bumps on her head." Ortiz observed discoloration on her back and "bruise discoloration" on her lower leg, above the ankle. According to Ortiz, the complainant's injuries were "numerous" and "obvious."

Deputy Ortiz further testified that he spoke to appellant, who showed no emotion, at the hospital to obtain her consent to take photographs of her apartment. In appellant's apartment, Ortiz found several prescription pill bottles with appellant's name on their labels. And he saw "lot[s] of empty alcohol bottles" in the closet in the bedroom.

HCSO Sergeant R. Hunter, the lead investigator assigned to the case, testified that on July 28, 2010, he was dispatched to the hospital following the "non[-]accidental" death of the complainant, who was nine-months old. He determined that appellant, Landon, and Sharma "lived with" and "had access to" the complainant. When Hunter spoke with appellant at the hospital, he noted that she was agitated and "appeared to be mad but not upset and crying." Based on his

"professional experience of having dealt with [similar] cases in the past," Hunter opined that appellant's behavior was "quite different than someone that's mourning for [her] child." After speaking to appellant, Landon, and Sharma at the hospital, they agreed to come to the HCSO station to be interviewed.

During one audio-recorded interview with appellant, admitted into evidence as State's Exhibit 92 and played for the jury at trial, Sergeant Hunter noted that she frequently referred to the complainant as "that baby." And appellant admitted to having left the complainant and Sharma alone in her apartment the morning of July 28, 2010 so that she could go to a liquor store, where she purchased "a 1.75-liter bottle of rum."

After listening to an audio recording of appellant's telephone call for emergency assistance, admitted into evidence as Defense's Exhibit 1 and played for the jury at trial, Sergeant Hunter further noted that appellant, on July 28, 2010, had a "slight slur" in her speech indicating that "there might have been some drinking" that had occurred that day, or that she "may have been under the influence of something." Based on his investigation, Hunter opined that appellant had "caused the injuries" sustained by the complainant who was dead at the time that appellant called for emergency assistance.

HCSO Lieutenant W. Kuhlman testified that on July 28, 2010, he was dispatched to appellant's apartment following the complainant's death. He noted

9

that appellant's apartment was "in desperate need of cleaning" and contained "really bad living conditions." In the closet in one of the bedrooms, Kuhlman found empty "alcoholic beverage containers, beer boxes, as well as rum bottles."

Lieutenant Kuhlman further testified that he conducted a video-recorded interview with appellant, admitted into evidence as State's Exhibit 93 and played for the jury at trial, during which she stated that the complainant, "a couple [of] weeks" before her death, had "stopped crawling" and would cry whenever she was "touched." Appellant, thinking this "was weird," further stated that she had also noticed that, about "a week or two" before the complainant's death, she had become "scared to death" of Sharma. And when Sharma would hold her, the complainant "would scream her head off." Appellant admitted, however, that she continued to allow Sharma to care for and bathe the complainant outside of appellant's presence.

Dr. Dwayne Wolf, the deputy chief medical examiner at the Harris County Institute of Forensic Sciences ("HCIFS"), testified that he performed an autopsy on the body of the complainant. He explained that an external examination of the complainant revealed contusions and abrasions on the top and back of her head, behind her ears,[4] on her right forehead, on her left cheek, and on both sides of her

---

[4] Dr. Wolf opined that the contusions behind the complainant's ears were caused by "impacts to the sides of [her] head."

10

jaw.[5]  There was also a hemorrhage near the complainant's wrist area; contusions on her upper chest, abdomen, and both upper and lower extremities; and "scabbed abrasion[s]" on "the right side of [her] chest," her "central back" area, and "the outer part of [her right] leg."  According to Wolf, the contusions sustained by the complainant were caused by "blunt force trauma"[6] by being "struck with an object."

In regard to the complainant's skull, Dr. Wolf's examination revealed that the contusions on her head were "extensive" and she had "fractures on both sides of [her] skull."  The fractures on the right side of the complainant's head looked as though they had been "healing . . . before the autopsy."  But the fractures on the left side of her head were "more acute" and had occurred "shortly before [her] death."  There also appeared to be "depressed fracture[s]" on the complainant's head, indicating an "impact of the head against [a] surface" or an "impact of a surface or object against the head."

---

[5]     Dr. Wolf noted that the complainant's jaw was fractured, with one fracture being consistent with "the front of [her] chin" being "impacted."

[6]     Dr. Wolf explained that by "blunt force trauma," he meant that the complainant had been struck with a "blunt object," such as "a table, floor, chair, hand, [or] fist."  And blunt force trauma would have occurred if the complainant's head had been struck "against a surface" or if she had been struck "with an object."

Also, on the back of the complainant's head were signs of "recent hemorrhaging," and some of the contusions and fractures on her head occurred "recent[ly]."[7]

Dr. Wolf opined that the contusions on the complainant's head were caused "by [an] impact with [a] elongated object or objects" and consistent with "a hand striking or slapping" the complainant. The complainant was "certainly . . . struck" on her head, and the hemorrhaging seen in her head was caused by "a significant impact of the head." Wolf also noted that there was "evidence of direct brain trauma" as the result of "a significant impact" and the complainant "likely would have been unconscious at some point before dying." He opined that there were likely "at least two or more separate incidents of head trauma" to the complainant, she had to have been struck with "a lot of force," and the injuries that she sustained were "not the kind of injuries [one] would expect to see from a childhood fall."

Dr. Wolf further noted that the complainant had a contusion on her left lung and "an impact on [her] back that's hard enough" it could have caused the lung to bleed. In other words, the lung contusion was the result of a "blunt trauma" with

---

[7]     Dr. Wolf noted that several contusions on the complainant's head were "from different time periods," with some being "acute or recent" and others having started to heal. He explained that some of the complainant's head injuries were "several days" old, while others were "probably less than six hours" old. In regard to the older skull fractures, Wolf opined that the complainant would have exhibited symptoms of lethargy or increased sleepiness, crankiness, "general malaise," or "not feeling well."

"considerable force." There appeared to be a bite mark on the complainant's arm. And her right forearm had a fracture that appeared to be healing, indicating that her arm had been broken several weeks prior to the autopsy. According to Wolf, the fracture on the complainant's arm would have prevented her from using her hand, and she would not have been able to crawl using that hand.

There was also a hemorrhage near the complainant's wrist area that was "much more recent," possibly "within six hours" of her death. In regard to the complainant's left leg, Dr. Wolf explained that her tibia and fibula had been fractured "near the time of [her] death" as a result of "bending [her] foot back or the lower part [her] leg back or an impact." And the location of the leg fractures was "consistent with [the complainant] being struck against something" or someone "grabbing onto [her] leg and possibly swinging th[e] leg."

Dr. Wolf further testified that his examination of the complainant revealed that she did not show any signs of illness or disease and nothing other than the injuries he described at trial would have prevented her "from living a healthy life." Based on the autopsy, Wolf opined that the cause of the complainant's death was "blunt trauma to the head with skull fractures of the brain injury" and her death was a result of a homicide.

Dr. Deborrah Pinto, a forensic anthropologist with the HCIFS, testified that she performed "a pediatric skeletal survey" of the complainant's body to assess the

13

extent of damage and the age of her various bone injuries.  Pinto explained that the fracture injuries to the right side of the complainant's skull[8] and her right arm were "healing injuries," which occurred "within a month" of her death.  However, the injuries to the left side of the complainant's skull,[9] jaw, left tibia, and left fibula[10] occurred "at or around the time of [the complainant's] death."  Pinto opined that at least "two traumatic events" had occurred—one "likely within the month prior to [her] death" and the other "at or around the time" of her death. It was also possible that more than two traumatic events had occurred.

Appellant testified that before the complainant was born, she had given birth to two other children.  Because she had "f[allen] on hard times," "didn't have money," was "getting evicted," and "didn't have anywhere to go," appellant sent her two children to live with her aunt with whom "they would have such a great life."  After "a year or two," appellant allowed her aunt to adopt her two children.

---

[8]     Dr. Pinto opined that fractures on the right side of the complainant's skull were caused by a "right to left . . . direct[] impact with an object of small-to-medium surface area" and not the ground.

[9]     Dr. Pinto explained that the fractures on the left side of the complainant's skull were caused by an "impact" with "something" with a "relatively small surface" area and not the ground.

[10]    Dr. Pinto noted that the fractures to the complainant's tibia and fibula would have been caused by her foot "being pushed into the leg; so some type of force [that would] driv[e] the foot and the leg together so that the bone gives way at the ankle and . . . just collapse[]."  The force needed to cause the tibia and fibula fractures would have been "significant," "more than just regular . . . day-to-day handling."

14

Her daughter is now "an honor student," and her son plays baseball at high school and is on a "Select Baseball team."

When appellant was "six months pregnant" with the complainant, she moved into the apartment complex with Landon. After her birth on October 4, 2009, the complainant lived in the apartment with "[a]t first just" appellant and Landon. When the complainant was "about three months old," Sharma, who had been living in a "catty-corner" apartment "with his wife, Michelle," moved into appellant's apartment. Appellant explained that Sharma lived in the apartment at "the time of [the complainant's] death" and continued to do so afterwards. Appellant admitted that after the complainant's death, she continued "sleeping in the same bedroom" with Sharma.

Appellant explained that she was not working when the complainant was born and it had been "[a]while" "since [she] had held a regular job." Her mother, in contrast, worked "normal hours during the day" and was "the sole source of income" for the household. A week before the complainant's death, Sharma began working the "night-shift." Before the complainant's death, appellant was home most of the time with the complainant. At all times, either appellant's mother or Sharma were there with her and the complainant, depending on the time of day. And, according to appellant, she would only "occasionally" drink alcoholic beverages.

15

On July 27, 2010, the day before the complainant's death, appellant called the complainant's pediatrician to make a "sick[-]baby appointment" because the complainant "wasn't feeling good." On July 28, 2010, the day of the complainant's death, appellant, after Landon "left for work," was "in [her] bed" when she "heard [the complainant] screaming." She then took the complainant from Sharma. She noted that this incident "didn't alarm" her because she "just thought [the complainant] was being cranky." She subsequently "went to the liquor store," leaving "only [Sharma] and [the complainant alone] in the apartment" for "[a]bout 15, 20 minutes."

When appellant returned to the apartment, she noticed that the complainant "didn't seem like she felt that well" and "felt hot," but otherwise "she was acting normally." Appellant then took the complainant's temperature, "gave her Tylenol," "fed [her] a bottle," and "held her for a little while" before "put[ting] her in [her baby] swing."

While the complainant was sleeping in her swing, appellant and Sharma started "watching TV" and "[h]aving [some] drinks." Appellant had "two or three" drinks, and after a few hours, Sharma went "to go get [the complainant's] blanket." He then "came running out," saying, "[t]here's something wrong. . . with [the complainant]" and "she [is not] breathing." Appellant then "immediately" called for emergency assistance.

16

In regard to the complainant, appellant agreed that she had been "an active baby," whose "main mode of transportation" was crawling. And when asked whether she had ever noticed the complainant "not being able to crawl because of the broken arm," appellant stated that "[s]he crawled. She was crawling." She explained, "[i]t wasn't like there was something wrong like she was hurt. She never cried. She was always laughing and happy." According to appellant, if she had noticed that the complainant was "unable to crawl because something was wrong with her arm or her leg," she "would have t[aken] her to the emergency room."

In regard to who she thought had caused the fractures to the complainant's skull and leg, appellant testified that, "I feel that [Sharma] did it." And although Landon had previously told her that the complainant had fallen, "like, three times . . . off the bed," appellant herself had never seen the complainant fall. She also stated that she had never seen Sharma "hit" or "drop" the complainant. Further, she explained that the "bump" on the complainant's forehead was "a mosquito bite" that had "welled up." Moreover, although she admitted that the "other bruises" on the complainant were "obvious," she stated that she "didn't see them" before. When appellant bathed the complainant the night before her death, she did not observe any "unusual mark or bruise" on the complainant's body.

Dr. Laeeq Khan, the complainant's pediatrician, testified about the complainant's medical care prior to her death and the developmental "checkup" examinations that he had conducted on the complainant. On cross-examination, Khan admitted that it would be "incredibly difficult for a 9-month-old to be mobile in any way" with the fractures that she had sustained to her arm. And he agreed that the complainant's arm fractures and external injuries observed at the time of her death "would certainly be noticeable and obvious" and would be "concerning" to a pediatrician and a parent.

## Sufficiency of the Evidence

In her first issue, appellant argues that the evidence is legally insufficient to support her conviction because the State did not prove that she "knowing[ly] injur[ed]" the complaint by omission. She asserts that there is "no evidence" that she "was aware with reasonable certainty that [the complainant] would be injured in any way" or that "an injury would have been prevented had [she] done something/anything to protect [the complainant] or sought medical attention for [the complainant] in a timely manner."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789

18

(1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which she is accused. *Id.*

We note that in reviewing the legal sufficiency of the evidence, a court must consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and a conviction may be supported by circumstantial evidence standing alone. *See Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the

witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.— Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of injury to a child if she intentionally, knowingly, or recklessly causes serious bodily injury by omission to a child when she has a legal duty to act. TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(1) (Vernon Supp. 2017); *see also* TEX. FAM. CODE ANN. § 151.001 (Vernon 2014) (rights and duties of parent). "Child" means a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(c)(1). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46) (Vernon Supp. 2017).

"Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750; *see also Thompson v. State*, 227 S.W.3d 153, 159 (Tex. App.— Houston [1st Dist.] 2006, pet. ref'd). Thus, "[t]he State must prove that a defendant caused a child's serious bodily injury with the requisite criminal intent." *Williams*, 235 S.W.3d at 750. A person acts "intentionally" or with intent "with respect to . . . a result of [her] conduct when it is [her] conscious objective or desire to . . . cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2011). A

person acts "knowingly" or with knowledge "with respect to a result of [her] conduct when [she] is aware that [her] conduct is reasonably certain to cause the result." *Id*. § 6.03(b).

Direct evidence of the required mental state is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Instead, proof of mental state almost always depends upon circumstantial evidence. *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Knowledge and intent may be inferred from any facts which tend to prove their existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the complainant. *Hart*, 89 S.W.3d at 64; *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999); *see also Stahle v. State*, 970 S.W.2d 682, 687 (Tex. App.—Dallas 1998, pet. ref'd) ("Knowledge may be inferred from an accused's acts, words, and conduct.").

Here, appellant stood accused by indictment of intentionally or knowingly causing serious bodily injury to the complainant, a child younger than fifteen years of age, by failing to protect her.[11]

---

[11]    Appellant also stood accused by indictment of intentionally or knowingly causing serious bodily injury to the complainant by failing to seek medical attention for her in a timely manner. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(1). The trial court's charge authorized the jury to convict appellant if it found she intentionally or knowingly caused serious bodily injury to the complainant, a child younger than fifteen years of age, by failing to protect her *or* by failing to seek medical attention for her in a timely manner. The jury returned a general verdict

Appellant specifically argues that the evidence is legally insufficient to establish that she was aware with reasonable certainty that her failure to protect the complainant would cause the complainant serious bodily injury because there is "no evidence" that she was aware of the complainant's previous injuries or that the complainant had suffered severe abuse before her death, such that appellant would have known that allowing Sharma or Landon to have access to the complainant would place the complainant in danger of sustaining further serious bodily injury.

There is ample evidence in the record that establishes that the complainant had suffered serious injuries that would have been apparent to appellant in the weeks leading up to her death. Forensic anthropologist Dr. Pinto testified about the age of the complainant's various bone injuries. And he explained that the fractures to the right side of the complainant's skull and her right arm were "healing injuries" that occurred "within a month" of her death. Similarly, Dr.

_____

of guilty of the felony offense of injury to a child as alleged in the indictment. "When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld." *Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002) (quoting *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997)); *see also Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) (when charge authorizes jury to convict defendant on more than one theory, verdict of guilt will be upheld if evidence sufficient on any theory authorized by jury charge). Thus, if the evidence is legally sufficient to support appellant's conviction of the offense of injury to a child based on her failure to protect the complainant, we need not address whether the evidence is sufficient to support appellant's conviction based on a failure to seek medical attention for the complainant in a timely manner. *See Russo v. State*, 228 S.W.3d 779, 795 (Tex. App.—Austin 2007, pet. ref'd); *see also* TEX. R. APP. P. 47.1.

Wolf, who performed the autopsy on the complainant's body, opined that there had likely been "at least two or more separate incidents of head trauma," noting that some of the complainant's head injuries were "several days" old.

Several witnesses testified that the trauma the complainant suffered in the weeks prior to her death would have been readily apparent. In regard to pain, Dr. Wolf explained that the head trauma she had suffered would have caused the complainant to exhibit symptoms of lethargy, sleepiness, crankiness, "general malaise," or "not feeling well." And the complainant's broken right forearm would have prevented use of her hand such that she would have been unable to crawl. Appellant's own witness, Dr. Khan, who was the complainant's pediatrician, agreed that these injuries would have been "noticeable and obvious" in a nine-month-old and "concerning" to him, both as a pediatrician and parent. *See Sandoval v. State*, No. 14-12-00879-CR, 14-12-00880-CR, 2014 WL 3870504, at *6 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014, no pet.) (mem. op., not designated for publication) (evidence sufficient to show defendant knew with reasonable degree of certainty her child abused, where child "covered in bruises at the time of her death" and testimony bone fractures and other injuries "would have caused the child pain"); *see also Guerrero v. State*, No. 04-15-00762-CR, 2016 WL 4537694, at *8 (Tex. App.—San Antonio Aug. 31, 2016, no pet.) (mem. op.,

not designated for publication) (knowledge failure to act substantially certain to result in serious bodily injury inferrable from apparent and obvious condition).

The record also shows that the complainant had visible injuries to her body at the time of her death. Deputy Ortiz, who saw the complainant at the hospital following her death, noted "numerous," "obvious," and "readily apparent" injuries, including "bruising on her cheek" and chest, a "lemon-size bump" on the right side of her head, "redness behind [her] ear," "some [other] bumps on her head," obvious discoloration on her back, and "bruise discoloration" on her lower leg. *See Tijerina v. State*, No. 13-11-00430-CR, 2012 WL 3525632, at *5 (Tex. App.— Corpus Christi Aug. 16, 2012, no pet.) (mem. op., not designated for publication) (eyewitness testimony concerning child's appearance provided evidence of extent of defendant's awareness of child's condition); *Payton v. State*, 106 S.W.3d 326, 328–30 (Tex. App.—Fort Worth 2003, pet. ref'd) (jury could reasonably conclude defendant knew eighteen-month-old child seriously injured because emergency medical personnel immediately noticed bruises and distended stomach caused by internal bleeding).

Dr. Wolf's external examination of the complainant also revealed evidence of what appeared to be a bite mark on her arm and "blunt force trauma," including bruises, contusions, and abrasions on the top and back of her head, on both sides of her jaw, behind her ears, and on her right forehead, left cheek, upper chest,

24

abdomen, back, and both upper and lower extremities. *See Tijerina*, 2012 WL 3525632, at \*5; *Payton*, 106 S.W.3d at 328–30.

There is also evidence that appellant had actual knowledge that the complainant had been seriously injured in the weeks before her death. In an interview with Lieutenant Kuhlman, appellant stated that "[a] couple of weeks" before the complainant's death, she noticed that the complainant had "stopped crawling" and would cry when "touched."[12] And at trial, appellant admitted that she had seen the "bump" on the complainant's forehead, although she stated that she believed it to be "a mosquito bite" that had "welled up" and when shown photographs of the complainant's body at trial, appellant acknowledged that many of the bruises were noticeable, although she could not explain why she had not noticed them before the complainant's death.

Parga-Lopez's testimony provides further evidence that appellant was aware that the complainant had been seriously injured in the weeks leading up to her death. While the complainant was in the care of Parga-Lopez's daughter, Dora,

---

[12] At trial, however, appellant testified that she did not notice the complainant "not being able to crawl because of the broken arm" and the complainant did not act "like there was something wrong like she was hurt. She never cried. She was always laughing and happy." However, the jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe appellant's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Further, we note that "inconsistent statements . . . are probative of wrongful conduct and are also circumstances of guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

she noticed that the complainant was "not her usual self" and "just laid [sic] there." She was also "fussy," "irritable," "didn't want to eat," or "play," and she was not smiling. Parga-Lopez discovered that the complainant's head was "real soft on the side," like "a gel." After she tried unsuccessfully to reach appellant, Parga-Lopez expressed her concerns about the complainant's head and demeanor to appellant's mother, Landon. Later, her lingering concern led Parga-Lopez to check on the complainant at appellant's apartment, where appellant assured her that she would "take [the complainant] to the doctor." *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *9 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (not designated for publication) (defendant's misrepresentation to witness she had sought medical care for child established defendant's knowledge child seriously ill, but refused to seek medical care).

There is also evidence in the record that appellant had motive not to protect the complainant because she did not want her. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt. Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." (internal citations omitted)). Parga-Lopez explained that during her pregnancy with the complainant, appellant confided that she did not want the complainant. And after the complainant's birth, appellant

asked Parga-Lopez to take the complainant permanently because she did not want her.

Parga-Lopez also testified that after she had visited appellant to communicate her concerns about the complainant, appellant stopped visiting her at the apartment complex's leasing office and instead "just stayed inside" her apartment. Parga-Lopez opined that appellant was "hiding something." *See Guevara*, 152 S.W.3d at 50 (attempts to conceal incriminating evidence probative of wrongful conduct and also circumstance of guilt); *Hart*, 89 S.W.3d at 64 (jury may infer both intent and knowledge from any facts tending to prove existence of mental states, including defendant's acts, words, or conduct); *In re P.M.S.*, No. 03-01-00178-CV, 2001 WL 1167166, at *2 (Tex. App.—Austin Oct. 4, 2001, no pet.) (not designated for publication) ("Proof of a culpable mental state generally relies upon circumstantial evidence, such as the suspicious conduct or statements of the actor . . . .").

Further, in her interview with Lieutenant Kuhlman, appellant stated that in the weeks before the complainant's death, she had become "scared to death" of Sharma. And when Sharma would hold her, the complainant "would scream her head off." Despite this, appellant admitted that she continued to allow Sharma to continue to care for and bathe the complainant outside of her presence. This includes the morning of the complainant's death, when, even after having "heard

27

[the complainant] screaming" while in Sharma's arms earlier that morning, appellant left the complainant with him so she could go to the "liquor store."

Appellant's delay in seeking medical assistance for the complainant on the day she died further indicates her intent. Despite Dr. Wolf's testimony that the complainant "likely would have been unconscious at some point before dying" due to the brain trauma that she had suffered from being struck on the head, appellant waited until the complainant had stopped breathing before calling for emergency assistance.[13] *See Vasquez v. State*, No. 13-08-00684-CR, 2011 WL 345919, at *20 (Tex. App.—Corpus Christi Jan. 31, 2011, no pet.) (mem. op., not designated for publication) (because defendant knew complainant sick and had thrown up many times, his stomach hurt, he had bruises to his lower abdomen and other parts of his body, and he had "labored" breathing, jury could reasonably conclude defendant

---

[13]     We note that in her brief, appellant asserts that the evidence shows that the only indication that she had that the complainant had suffered head trauma before her death led her to take the complainant to her pediatrician, Dr. Khan, on July 6, 2010. She points out that, according to medical testimony, it is possible that the first skull fracture could already have been inflicted at this point. She then asserts that it had, and that she had misidentified, and Dr. Khan's physician's assistant misdiagnosed, it as conjunctivitis and rhinitis. However, the jury was free to accept or reject this explanation. Evidence is not insufficient merely because a defendant offers a different explanation for the facts. *See Jenkins v. State*, No. 01-05-00299-CR, 2006 WL 23323, at *6 (Tex. App.—Houston [1st Dist.] Jan. 5, 2006, pet. ref'd) (mem. op., not designated for publication); *Coleman v. State*, 113 S.W.3d 496, 502 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 145 S.W.3d 649 (Tex. Crim. App. 2004). And the fact finder alone determines what weight to place on contradictory testimonial evidence, as it depends on the evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997); *Jenkins*, 2006 WL 23323, at *6.

knew complainant suffered some sort of blunt-force trauma requiring medical treatment); *see also Hart*, 89 S.W.3d at 64 (jury may infer both intent and knowledge from any facts tending to prove existence of mental states, including defendant's acts, words, or conduct); *In re P.M.S.*, 2001 WL 1167166, at *2 (proof of culpable mental state generally relies upon circumstantial evidence, such as suspicious conduct or statements of actor).

Further, several witnesses were troubled by appellant's incongruous demeanor in response to the complainant's death. Dr. Kasper, the emergency physician who treated the complainant at the hospital, testified that "the affect of [appellant] was very strange in general," describing it as "blunted" and not "want[ing] to be involved." Deputy Ortiz, who observed appellant at the hospital, noted that "there was no emotion." And Sergeant Hunter noted that appellant appeared to be agitated, but "not upset or crying." He further opined that her behavior was "quite different than someone that's mourning for [her] child." *See Hart*, 89 S.W.3d at 64 (jury may infer both intent and knowledge from any facts tending to prove their existence, including defendant's acts, words, or conduct); *In re P.M.S.*, 2001 WL 1167166, at *2 (proof of culpable mental state generally relies upon circumstantial evidence, such as actor's suspicious conduct or statements).

Finally, appellant does not dispute the fact that she continued living with Sharma, who she believed was responsible for the complainant's injuries. *See*

29

*Hart*, 89 S.W.3d at 64 (jury may infer both intent and knowledge from any facts tending to prove their existence, including defendant's acts, words, or conduct); *In re P.M.S.*, 2001 WL 1167166, at *2 (proof of culpable mental state generally relies upon circumstantial evidence, such as actor's suspicious conduct or statements).

Given the record evidence that appellant was made aware of the soft spot on the complainant's skull; appellant admitted that she knew the complainant had stopped crawling and would cry when touched, especially when being touched by Sharma; appellant admitted that many of the complainant's bruises were immediately apparent; and appellant did not want the complainant, the jury could have reasonably concluded that appellant was aware with reasonable certainty that failing to protect the complainant, by preventing her from being left in the care of those who were supervising her when her injuries occurred, would continue to result in serious bodily injury to the complainant. *See Sandoval*, 2014 WL 3870504, at *6 (evidence sufficient to show defendant knew with reasonable degree of certainty girlfriend abusing child, where "the complainant was covered in bruises at the time of her death" and testimony bone fractures and other injuries "would have caused the child pain"); *Dusek v. State*, 978 S.W.2d 129, 134 (Tex. App.—Austin 1998, pet. ref'd) (jury could rationally conclude mother of child whose body covered by many large bruises of varying ages knew boyfriend abusing child).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found that appellant intentionally or knowingly caused serious bodily injury by omission to a child by failing to protect the complainant when she had a legal duty to act.[14]  *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(1); TEX. FAM. CODE ANN. § 151.001; *see also Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Williams*, 235 S.W.3d at 750.  Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction for injury to a child.

We overrule appellant's first issue.

## Ineffective Assistance of Counsel

In her second through thirteenth issues, appellant argues that her trial counsel did not provide her with effective assistance because counsel did not "object to the State's closing argument"; "discover whether the State intended to use extraneous conduct against [a]ppellant"; "request notice of expert witnesses"; "object[] to the introduction of" a portion of State's Exhibit 4; "apply for a subpoena"; "object to the [trial court's] charge" to the jury or "request[] an appropriate instruction on the issue of 'but for' causation"; "object to [Sergeant]

---

[14]    Having held that the evidence is sufficient to support appellant's conviction for the offense of injury to a child based on her failure to protect the complainant, we do not reach the issue of whether the evidence is sufficient to support appellant's conviction based on the alternative theory of failure to seek medical attention.  *See Anderson*, 416 S.W.3d at 889; *see also* TEX. APP. P. 47.1.

Hunter's opinion testimony"; "object to inadmissible, extraneous, prejudicial, character conformity evidence"; "request a limiting instruction to inadmissible, extraneous, prejudicial, character conformity evidence"; "give an opening statement"; or move for a directed verdict.

The Sixth Amendment guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). To prove a claim of ineffective assistance of counsel, appellant must show that (1) her trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs of the *Strickland* test by a preponderance of the evidence. *Jackson v. State*, 973

32

S.W.2d 954, 956 (Tex. Crim. App. 1998). An appellant's failure to satisfy one prong of the test negates a court's need to consider the other prong. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In rare cases in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. However, the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*

### Closing Argument

In her second and thirteenth issues, appellant argues that her trial counsel improperly failed to object to the State's closing argument to the jury because the State "asked the jury to convict on a theory contrary to the law and the jury charge" and its argument "was outside the four general areas of jury argument."

In her second issue, appellant complains about the following portion of the State's closing argument:

> Now, intentionally and knowingly, there's something a little different
> here that we didn't have in voir dire. Intentionally and knowingly

doesn't go to her causing the actual injuries, right? Because she's charged with omission. That mental state of intentionally and knowingly means that she intentionally and knowingly failed to get medical attention that the child needed. She intentionally and knowingly failed to protect that child, as opposed to recklessly. And so, that's pretty obvious with the evidence, right?

Appellant asserts that "to properly convict [her]," the State had to prove that she "consciously and deliberately omitted performing some act, . . . knowing that 'but for' that omission, [the complainant's] death was reasonably certain." The State does not dispute this characterization of its burden. However, it responds that, taken in context, the complained-of argument was merely a botched effort to explain that it "was not required to prove that appellant caused the initial injuries to the complainant." The State acknowledges that it was "required to prove that appellant caused additional serious bodily injury to the complainant by failing to seek medical attention . . . [or] by failing to protect the complainant." And it notes that it, later in its closing argument, explained to the jury, "you have to agree overall that [appellant] caused serious bodily injury by omission."

Here, although the State's inartful explanation to the jury of a complex legal concept may not have been ideal, we cannot conclude that appellant's trial counsel's decision to not object to it was "so outrageous that no competent attorney" would have done the same. *See Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed*, 187 S.W.3d at 392). Trial counsel could have reasonably concluded that it was unnecessary to object to the

34

complained-of argument because the trial court had already properly instructed the jury on the subject, and counsel did not want to further confuse the jury. *See Brown v. State*, 482 S.W.3d 157, 164 (Tex. App.—Texarkana 2015, no pet.) (trial counsel could have found it unnecessary to address misstatement by State in closing argument because "the trial court was going to instruct the jury on the proper standard of proof and/or because he did not want to further confuse the jury"); *see also Helmke v. State*, No. 04-12-00826-CR, 2013 WL 5570474, at *3 (Tex. App.—San Antonio Oct. 9, 2013, no pet.) (mem. op, not designated for publication) (assistance not ineffective where alleged misstatement of law by trial counsel was considered in context of other statements).

Where a reviewing court can conceive of a potentially reasonable trial strategy that counsel could have been pursuing, it "simply cannot conclude that counsel has performed deficiently." *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005). Accordingly, in the absence of a record reflecting why appellant's trial counsel did not object to the complained-of statements, and given the strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, we hold that appellant has failed to rebut the presumption that her trial counsel's decision to not object was reasonable. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (appellate court may not conclude, based on speculation, counsel ineffective when record silent

about why he made decisions at trial); *see also Miles v. State*, No. 01-11-00401-CR, 2012 WL 2357449, at *4 (Tex. App.–Houston [1st Dist.] June 21, 2012, no pet.) (mem. op., not designated for publication) ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance.").

In her thirteenth issue, appellant complains about the following portion of the State's closing argument:

> And as you've sat there this week, I know that many of you have thought, I wish [the complainant] had been older so she could run to [Parga-Lopez]'s apartment and say, [Parga-Lopez] my mommy's hurting me. [Sharma], he's hurting me, please help me. I know many of you have thought that. She could call her Aunt . . . and say, Please save me like you did [appellant's two older children].

Proper jury argument generally must concern one of the following areas: (1) a summation of the evidence presented at trial, (2) a reasonable deduction drawn from that evidence, (3) an answer to opposing counsel's argument, or (4) a plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Although appellant argues in her brief that because the complained-of statements "fell outside of the four areas of [permissible] jury argument," her trial counsel should have objected to them, she provides no supporting argument or authorities, nor any analysis or explanation, to support her argument. *See Tufele v.*

36

*State*, 130 S.W.3d 267, 271 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("Appellant has a duty to cite specific legal authority and to provide legal argument based upon that authority.").

An appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). And an appellant waives an issue on appeal if she does not adequately brief that issue, i.e., by presenting supporting arguments and authorities. *Id.*; *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000). Accordingly, we hold that she has waived her complaint that her trial counsel provided her ineffective assistance by not objecting to the State's closing argument as "outside the four general areas of jury argument." *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (point of error inadequately briefed "presents nothing for review"); *Ruiz v. State*, 293 S.W.3d 685, 693 (Tex. App.—San Antonio 2009, pet. ref'd) (complaint waived where defendant's brief "contain[ed] no argument or authorities" to support contention that his counsel was ineffective); *Tufele*, 130 S.W.3d at 270–71 (ineffective-assistance-of-counsel complaint waived for inadequate briefing); *see also Castellanos v. State*, No. 13-04-023-CR, 2005 WL 1981519, at *2 (Tex. App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op., not designated for publication) (defendant waived

ineffective-assistance-of-counsel complaint by "fail[ing] to make a clear and concise argument with appropriate citations" as required by rule 38.1).

We overrule appellant's second and thirteenth issues.

## *"Extraneous Conduct" Evidence*

In her third, ninth, and tenth issues, appellant asserts that her trial counsel provided ineffective assistance regarding certain "extraneous conduct" evidence admitted at trial.[15]

In her third issue, appellant argues that her trial counsel provided ineffective assistance in not filing a written request "to discover whether the State intended to use extraneous conduct [evidence] against [her]" at trial because it used such evidence to suggest that she was "a miserable mother of two other children." And

---

[15] In discussing "extraneous conduct [evidence]," appellant directs us to the following evidence admitted at trial:

> (1) appellant's two older children went to live with, and were ultimately adopted by, appellant's aunt; (2) appellant failed to appear in court in connection with her custody of her two older children, resulting in full custody being awarded to her aunt; (3) the complainant was exposed to methadone at birth; (4) appellant did not want the complainant; (5) appellant offered to give the complainant away; (6) Child Protective Services was involved in supervising appellant's custody of the complainant; (7) appellant on occasions other than the date of the complainant's death commonly went to Spec's liquor store to purchase liquor within 15 minutes of 10:00 a.m. opening time; (8) appellant came from a family with divorced parents; (9) none of appellant's children share the same father; (10) none of appellant's children's fathers were in the children's lives; (11) appellant lived with Sharma, a married man; (12) appellant continued living with Sharma after the complainant's death; and (13) appellant and Sharma lived off of appellant's mother.

"[h]ad trial counsel filed a . . . request in an attempt to discover whether the State intended to use extraneous conduct [evidence] against [a]ppellant, the State would have been compelled to give notice" of such evidence.

The record is silent as to why appellant's trial counsel did not file a written request "to discover whether the State intended to use extraneous conduct [evidence] against [her]" at trial. *See Menefield*, 363 S.W.3d at 593 ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim.") (internal quotations omitted)); *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record.") (internal quotations omitted)). Therefore, we must presume that counsel was acting pursuant to a sound trial strategy. *See Bone*, 77 S.W.3d at 833; *see also Thompson v. State*, 9 S.W.3d 808, 813 ("There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."); *Crocker v. State*, 441 S.W.3d 306, 315 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("Because the record is silent concerning counsel's reasons for not objecting, we must presume counsel had a valid strategy."); *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.) ("Without evidence of the strategy and methods

involved concerning counsel's actions at trial, the court will presume sound trial strategy.").

Further, in general, a trial counsel's failure to file pre-trial motions such as a request for notice of intent to introduce "extraneous conduct" evidence does not rise to the level of ineffective assistance of counsel. *See Autry v. State*, 27 S.W.3d 177, 182 (Tex. App.—San Antonio 2000, pet. ref'd) (trial counsel may have received oral notice from State and defendant "has not stated what steps he would have taken if he had received written notice of the State's intent to introduce extraneous evidence"); *see also Petty v. State*, No. 01-01-00213-CR, 2001 WL 1315028, at *4 (Tex. App.—Houston [1st Dist.] Oct. 25, 2001, pet. ref'd) (not designated for publication) (defendant did not meet burden of showing trial counsel's deficient performance because he "did not show that the State did not provide oral notice. . . [which] would explain why defense counsel did not object" (internal citations omitted)).

Accordingly, in the absence of a record reflecting why appellant's trial counsel did not file a written request "to discover whether the State intended to use extraneous conduct [evidence] against [her]" at trial, and given the strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, we hold that appellant has failed to rebut the presumption that her trial court's decision was reasonable. *See Jackson*, 877 S.W.2d at 771

(appellate court may not conclude, based on speculation, counsel ineffective when record silent about why he made decisions at trial); *see also Miles*, 2012 WL 2357449, at *4 ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance.").

In her ninth and tenth issues, appellant argues that her trial counsel provided ineffective assistance in not objecting to or "request[ing] a limiting instruction," pursuant to Texas Rule of Evidence 105(a), about certain "extraneous conduct" evidence because such evidence was inadmissible under Texas Rules of Evidence 401, 402, 403, 404, and 405.

As previously noted, an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." *See* TEX. R. APP. P. 38.1(i); *see also Tufele*, 130 S.W.3d at 271 ("Appellant has a duty to cite specific legal authority and to provide legal argument based upon that authority."). And an appellant waives an issue on appeal if she does not adequately brief that issue by presenting supporting arguments and authorities. *Id.*; *Cardenas*, 30 S.W.3d at 393.

Here, appellant has not made any attempt to demonstrate how the admission of the "extraneous conduct" evidence about which she complains violates the Texas Rules of Evidence, or how her trial counsel rendered ineffective assistance

41

by not objecting to such evidence or requesting a limiting instruction. Accordingly, we hold that she has waived her complaint that her trial counsel provided ineffective assistance in not objecting to or "request[ing] a limiting instruction," pursuant to Texas Rule of Evidence 105(a), about certain "extraneous conduct" evidence. *See Lucio*, 351 S.W.3d at 896–97; *Ruiz*, 293 S.W.3d at 693; *Tufele*, 130 S.W.3d at 270–71; *see also Castellanos*, 2005 WL 1981519, at *2.

We overrule appellant's third, ninth and tenth issues.

### *Notice of Expert Witnesses*

In her fourth issue, appellant argues that her trial counsel provided ineffective assistance in not "request[ing] notice of [the] expert witnesses" to be called by the State because "[o]ne purpose of requesting and receiving notice of expert witnesses is to adequately prepare for cross-examination" and "[i]t [is] patently clear from the record that [trial] counsel . . . failed to accomplish any meaningful cross-examination of the State's expert[]" witnesses.

Here, we note that the State supplied appellant with its expert witness list well in advance of trial, making trial counsel's decision not to request it of no consequence to the outcome of the trial. Thus, we cannot conclude that there is a reasonable probability that but for counsel's purported error, the result of the proceeding would have been different. *See Fisher v. State*, No. 09-11-00379-CR, 2012 WL 5450828, at *4 (Tex. App.—Beaumont Nov. 7, 2012, no pet.) (mem. op.,

not designated for publication) (defendant failed to show prejudice because "[r]egardless of the fact that trial counsel failed to make a motion, all of the State's expert witnesses were timely designated" and defendant failed to allege how filing motion for timely designation of experts "reasonably could have changed the outcome of his case"); *Arnolie v. State*, No. 01-11-00348-CR, 2012 WL 1143591, at *3 (Tex. App.—Houston [1st Dist.] April 5, 2012, no pet.) (mem. op., not designated for publication) (rejecting ineffective-assistance complaint based on failure to timely request notice of "other bad acts" because record indicated counsel received notice). Accordingly, we hold that appellant has not shown that she suffered prejudice because her counsel did not "request notice of [the] expert witnesses" to be called by the State. *See Ladd v. State*, 3 S.W.3d 547, 570 (Tex. Crim. App. 1999) (defendant's failure to make any effort to prove prejudice from counsel's allegedly deficient performance precluded relief on ineffective-assistance claim); *Mitchell v. State*, 989 S.W.2d 747, 748 (Tex. Crim. App. 1999) (defendant claiming ineffective assistance of counsel must affirmatively prove prejudice from counsel's deficient performance); *see also Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012) (reviewing court need not consider both prongs of *Strickland* test and can dispose of ineffectiveness claim if defendant fails to demonstrate sufficient prejudice).

We overrule appellant's fourth issue.

43

*Sixth Amendment Right to Confrontation*

In her fifth and sixth issues, appellant asserts that her trial counsel provided ineffective assistance regarding her Sixth Amendment right to confront forensic neuropathologist Dr. Glenn Sandberg.

In her fifth issue, appellant argues that her trial counsel provided ineffective assistance in not objecting to the admission into evidence of Dr. Sandberg's report, contained within State's Exhibit 4, the autopsy report prepared by Dr. Wolf, because it "was inadmissible under (1) the Confrontation Clause of the Sixth Amendment . . . , (2) *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1345, 158 L.Ed.2d 177 (2004), and (3) Tex. R. Evid. 801(d)."

The record is silent as to why appellant's trial counsel did not object to the admission of Dr. Sandberg's report into evidence. *See Menefield*, 363 S.W.3d at 593 ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim.") (internal quotations omitted)); *Bone*, 77 S.W.3d at 835 ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record.") (internal quotations omitted)). Therefore, we must presume that counsel was acting pursuant to a sound trial strategy. *See Bone*, 77 S.W.3d at 833; *see also Thompson*, 9 S.W.3d at 813 ("There is a strong presumption that counsel's conduct fell within the wide range of reasonable

44

professional assistance."); *Crocker*, 441 S.W.3d at 315 ("Because the record is silent concerning counsel's reasons for not objecting, we must presume counsel had a valid strategy."); *Smith*, 84 S.W.3d at 42 ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy."). As the Texas Court of Criminal Appeals, in regard to the admission of a laboratory report, explained in *Menefield*, "[w]e [simply] do not know why counsel failed to raise a Confrontation Clause objection." 363 S.W.3d at 593. "[P]erhaps the State could (and with an objection would) have brought [the report's author] to the courtroom to testify, and counsel realized that cross-examining [him] would not benefit his client." *Id.*

Accordingly, in the absence of a record reflecting why appellant's trial counsel did not object to the admission into evidence of Dr. Sandberg's report, and given the strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, we hold that appellant has failed to rebut the presumption that her trial counsel's decision not to object was reasonable. *See Jackson*, 877 S.W.2d at 771 (appellate court may not conclude, based on speculation, counsel ineffective when record silent about why he made decisions at trial); *see also Miles*, 2012 WL 2357449, at *4 ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance.").

In her sixth issue, appellant argues that her trial counsel provided ineffective assistance in not "apply[ing] for a subpoena for the appearance of" Dr. Sandberg because it deprived her of her constitutional right of confrontation. Appellant's brief includes only a single conclusory statement: "Should this Court find that Dr. Glenn Sandberg's report was admissible, trial counsel failed to secure the attendance of Dr. Glenn Sandberg to enforce Appellant's Sixth Amendment right to confrontation." Because appellant offers no argument or authorities, nor any analysis or explanation, to support her assertion, we hold that she has waived her complaint that her trial counsel provided her with ineffective assistance in not "apply[ing] for a subpoena for the appearance of" Dr. Sandberg. *See* TEX. R. APP. P. 38.1(i); *Cardenas*, 30 S.W.3d at 393; *see also Lucio*, 351 S.W.3d at 896–97; *Ruiz*, 293 S.W.3d at 693; *Tufele*, 130 S.W.3d at 270–71; *see also Castellanos*, 2005 WL 1981519, at *2.

We overrule appellant's fifth and sixth issues.

## *Jury Charge*

In her seventh issue, appellant argues that her trial counsel provided ineffective assistance in not objecting to the trial court's charge to the jury and not "mak[ing] a request for the inclusion of an appropriate instruction on the issue of 'but for' causation," pursuant to Texas Penal Code section 6.04(a), because had

counsel requested the "'but for' causation instruction," the jury would have been prohibited from "convicting [appellant] on a theory that was contrary to the law."

Assuming without deciding that appellant was entitled to the above-referenced instruction, she still must show that her trial counsel's performance fell below an objective standard of reasonableness when considering prevailing professional norms. *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064; *Bone*, 77 S.W.3d at 833. Here, the record is silent as to why appellant's trial counsel did not object to the trial court's charge to the jury or why her trial counsel did not request the jury instruction to which she now contends she was entitled. *See Henderson v. State*, 29 S.W.3d 616, 624 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (overruling defendant's ineffective-assistance claim, where "[t]here [was] no evidence in the record as to why [his] trial counsel did not request an instruction on concurrent causation"); *see also Menefield*, 363 S.W.3d at 593 ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim.") (internal quotations omitted)); *Bone*, 77 S.W.3d at 835 ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record.") (internal quotations omitted). Therefore, we must presume that counsel was acting pursuant to a sound trial strategy. *See Bone*, 77 S.W.3d at 833; *Thompson*, 9 S.W.3d at 813 ("There is a strong presumption that

47

counsel's conduct fell within the wide range of reasonable professional assistance."); *Crocker*, 441 S.W.3d at 315 ("Because the record is silent concerning counsel's reasons for not objecting, we must presume counsel had a valid strategy."); *Smith*, 84 S.W.3d at 42 ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy.").

Accordingly, in the absence of a record reflecting why appellant's trial counsel did not object to the trial court's charge to the jury or "make a request for the inclusion of an appropriate instruction on the issue of 'but for' causation," pursuant to Texas Penal Code section 6.04(a), and given the strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, we hold that appellant has failed to rebut the presumption that her trial counsel's decision not to object or to request a certain instruction was reasonable. *See Jackson*, 877 S.W.2d at 771 (appellate court may not conclude, based on speculation, counsel ineffective when record silent about why he made decisions at trial); *see also Miles*, 2012 WL 2357449, at *4 ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance.").

We overrule appellant's seventh issue.

*Opinion Testimony*

In her eighth issue, appellant argues that her trial counsel provided ineffective assistance in not objecting to Sergeant Hunter's "opinion testimony" that she "cried 'tears of guilt' and acted like 'a mother who did something to her child'" because Hunter "comment[ed] directly on the credibility and guilt of [a]ppellant."

The record is silent as to why appellant's trial counsel did not object to Sergeant Hunter's "opinion testimony." *See Lopez*, 343 S.W.3d at 143–44 (defendant did not meet burden of proving ineffective assistance where record silent as to why trial counsel did not object to witness testimony); *see also Menefield*, 363 S.W.3d at 593 ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim.") (internal quotations omitted)); *Bone*, 77 S.W.3d at 835 ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must be firmly founded in the record.") (internal quotations omitted)). Therefore, we must presume that counsel was acting pursuant to a sound trial strategy. *See Bone*, 77 S.W.3d at 833; *Thompson*, 9 S.W.3d at 813 ("There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."); *Crocker*, 441 S.W.3d at 315 ("Because the

record is silent concerning counsel's reasons for not objecting, we must presume counsel had a valid strategy."); *Smith*, 84 S.W.3d at 42 ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy.").

Accordingly, in the absence of a record reflecting why appellant's trial counsel did not object to Sergeant Hunter's "opinion testimony" and given the strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance, we hold that appellant has failed to rebut the presumption that her trial court's decision not to object was reasonable. *See Jackson*, 877 S.W.2d at 771 (appellate court may not conclude, based on speculation, counsel ineffective when record silent about why he made decisions at trial); *see also Miles*, 2012 WL 2357449, at *4 ("In the absence of a record reflecting why [defendant]'s counsel did not object, we hold that the record does not firmly establish deficient performance.").

We overrule appellant's eighth issue.

### Opening Statement

In her eleventh issue, appellant argues that her trial counsel provided ineffective assistance in not "giv[ing] an opening statement" to the jury because this case involved "an incredibly emotional trial" and counsel "fail[ed] to attempt to focus the jury on the facts applicable to the law."

In her brief, appellant summarily asserts that "[a]t the inception of this trial, trial counsel metaphorically and literally started on the bench. This conduct 'fell below the objective standard of reasonableness under prevailing professional norms.'" She neither asserts, nor shows, that her trial counsel's decision to not make an opening statement, an entirely discretionary and inherently tactical decision, probably caused the jury to return a guilty verdict against her. *See* TEX. CODE CRIM. PROC. ANN. art. 36.01(b) (Vernon 2007) (opening statement optional); *see also Jones v. State*, No. 08-14-00122-CR, 2017 WL 3048575, at *6–8 (Tex. App.—El Paso July 19, 2017, no pet.) (not designated for publication) (failure to meet second *Strickland* prong where defendant did not show "a reasonable probability that the outcome of trial would have been different if [trial counsel] had made an opening statement"); *Hernandez v. State*, No. 04-01-00242-CR, 2002 WL 31465802, at *4 (Tex. App.—San Antonio Nov. 6, 2002, no pet.) (not designated for publication) (defendant who did "not direct this court to anywhere in the record that indicates he was prejudiced by counsel's decision not to make an opening statement," not prejudiced by counsel's actions); *Hernandez v. State*, No. 04-00-00151-CR, 2000 WL 1727098, at *4 (Tex. App. San Antonio—Nov. 22, 2000, no pet.) (not designated for publication) (defendant "cannot demonstrate the prejudice required in the second prong of the *Strickland* test" because he "has not pointed out evidence in the record which shows how an opening statement could have caused

the jury to return a not guilty verdict"); *Calderon v. State*, 950 S.W.2d 121, 127 (Tex. App.—El Paso 1997, no pet.) ("Few matters during a criminal trial could be more imbued with strategic implications than the exercise of th[e] option [to give an opening statement]."); *Standerford v. State*, 928 S.W.2d 688, 697 (Tex. App.—Fort Worth 1996, no pet.) (because giving opening statement provides State preview of defense strategy, decision to not make opening statement "valid tactical decision").

Accordingly, we hold that appellant has not shown that she suffered prejudice by her trial counsel's decision not to make an opening statement. *See Ladd*, 3 S.W.3d at 570 (defendant's failure to make any effort to prove prejudice from counsel's allegedly deficient performance precluded relief on ineffective assistance claim); *Mitchell*, 989 S.W.2d at 748 (defendant claiming ineffective assistance of counsel must affirmatively prove prejudice from counsel's deficient performance); *see also Cox*, 389 S.W.3d at 819 (reviewing court need not consider both prongs of *Strickland* test and can dispose of ineffectiveness claim if defendant fails to demonstrate sufficient prejudice).

We overrule appellant's eleventh issue.

### *Directed Verdict*

In her twelfth issue, appellant argues that her trial counsel provided ineffective assistance in not moving for a directed verdict because "[t]he evidence

in this case was legally insufficient" and "[h]ad trial counsel made a motion for a directed verdict, the trial court [w]ould have granted that motion." Because appellant offers no argument or authorities, nor any analysis or explanation, to support her argument, we hold that she has waived her complaint that her trial counsel provided her with ineffective assistance of counsel by not moving for a directed verdict. *See* TEX. R. APP. P. 38.1(i); *Cardenas*, 30 S.W.3d at 393; *see also Lucio*, 351 S.W.3d at 896–97; *Ruiz*, 293 S.W.3d at 693; *Tufele*, 130 S.W.3d at 270–71; *see also Castellanos*, 2005 WL 1981519, at *2. Further, having held that the evidence adduced at trial is sufficient to support her conviction, we note that appellant would not have been entitled to a directed verdict. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (challenge to trial court's ruling on motion for directed verdict is challenge to sufficiency of evidence to support conviction, and is reviewed under same standard).

We overrule appellant's twelfth issue.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).